Filed 10/21/21  Hansen v. Hilton & Hyland Real Estate CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| CHRISTOPHER HANSEN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>HILTON & HYLAND REAL ESTATE et al.,<br><br>Defendants and Respondents. | B305592<br><br>(Los Angeles County Super. Ct. No. BC673414) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Murphy, Judge.  Affirmed.

Law Office of Donna Kirkner and Donna E. Kirkner for Plaintiffs and Appellants Christopher Hansen and Deanna Hansen.

Tuchman & Associates, Aviv L. Tuchman, Loren N. Cohen, Michael C. Dicecca; Greines, Martin, Stein & Richland, Robert A. Olson and Eleanor S. Ruth for Defendants and Respondents Hilton & Hyland Real Estate and Alphonso Lascano.

———————————————

Christopher and Deanna Hansen appeal the judgment entered in their lawsuit against their real estate broker, Hilton & Hyland Real Estate, and its associated real estate agent, Alphonso Lascano (collectively broker defendants), for breach of fiduciary duty and related torts. The Hansens contend the trial court erred in granting the broker defendants' motion for summary judgment because triable issues of material fact exist as to whether the broker defendants breached duties owed to them and whether those breaches caused the Hansens' alleged injury—an arbitration ruling in favor of the buyers of their home for more than $760,000. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Purchase/Sale of Real Property*

In May 2016 the Hansens accepted an offer from brothers Jee Yong Shin and Stefan J. Shinn (the Shin/Shinns) to purchase the Hansens' Los Angeles home for $1.8 million. The broker defendants represented both the Hansens and the Shin/Shinns in the transaction and obtained from each of them a signed acknowledgment of, and agreement to, the broker defendants' dual representation. In addition, various California Association of Realtors (C.A.R.) documents the Hansens and the Shin/Shinns signed in connection with the sale—the disclosure regarding the real estate agency relationship, statewide buyer and seller advisory and the residential purchase agreement and joint escrow instructions—advised the broker was not responsible for providing legal or tax advice and that the buyer/seller should seek such advice from a licensed professional if desired.

Four days before the scheduled July 26, 2016 close of escrow, a ceiling sprinkler pipe burst on the fourth floor of the Hansens' home, causing significant water damage throughout the

2

residence. The parties discussed whether the sale would still go forward. After the Hansens received confirmation from their home insurer, State Farm Insurance Company, that the damages to the home were covered under the Hansens' homeowner's policy, on July 28, 2016 the Hansens and the Shin/Shinns agreed to, and signed, an addendum to the purchase/sale agreement. Neither the Shin/Shinns nor the Hansens sought the assistance of counsel and, apart from the disclosures in the C.A.R. documents, Lascano did not advise them to speak to a lawyer before they agreed to the addendum. Escrow closed on July 29, 2016.

2. *The Addendum to the Purchase/Sale Agreement*

The addendum to the purchase/sale contract provided: (1) The purchase price of $1.8 million would be discounted by $22,000 (a $20,000 deduction plus the buyers would receive free of charge outdoor furniture that the buyers had previously agreed to buy from the Hansens for $2,000). (2) The Hansens "will place $60,000 of the sale proceeds into an immediate escrow account. This gives assurances that the repairs will be performed by the contractors chosen by Buyers[ ] and paid for by State Farm (claim # 75-8W17-665 insured by Chris and Deanna Hansen) to Buyers' contractor. Once the repairs are complete to the satisfaction of the buyers, $20,000 will be released from escrow to the buyers and $40,000 will concurrently be released from escrow to the sellers. Until the buyers are satisfied (or a new deal for the escrow holdback monies is jointly negotiated), the full $60,000 will remain parked in escrow." (3) The Hansens "agree to pay Buyers' PITI [principal, interest, taxes and insurance] from close of escrow until completion of all restoration work." (4) "Once Sellers have notified Buyers that all work has been completed by

3

Sellers and Buyers' contractor, Buyers will approve all finish work at final walk through and agree to sign off the release of holdback funds to Sellers less $20,000 and any PITI that Sellers may still owe to Buyers." (5) "Buyers understand that Sellers will be replacing like-for-like materials. If Buyers wish to upgrade an item, Buyers will pay the cost difference for upgraded choice." (6) "Sellers agree that once Servpro [the mold remediation company] has completed the demolition and has given clearance to start finish work, Sellers will perform an ambient test to ensure house is moist free. Company of Buyers' choice will perform ambient test." (7) "Sellers agree to pay all utilities from July 21st until buyers take possession of the property." (8) "Buyers recognize that time is of the essence. Delays will be costly. Buyers will act promptly to plan, coordinate and perform work on the house. For example, finish choices will be selected in advance and the re-build job will be scheduled in advance so that Buyers' contractor can proceed immediately with the re-build once Servpro has completed the demolition work and the ambient test has confirmed that the house is moisture free." (9) If State Farm "fails to pay any replacement cost for similar construction, Sellers agree to pay to contractor any replacement cost for similar construction."

3. *The Dispute Between the Hansens and the Shin/Shinns*

Almost immediately after escrow closed the Hansens disputed their obligations under the addendum. The Hansens insisted they had the right to review and approve repair estimates from any contractor the Shin/Shinns selected before turning over any of the insurance proceeds they received from State Farm to pay for the repairs. The Shin/Shinns disagreed with that interpretation of the addendum, but, over the course of

several weeks in August and September 2016, provided to Christopher Hansen six estimates from general contracting companies, ranging in price from $173,310 to $185,200. Christopher Hansen rejected each one of these estimates as inflated, lacking sufficient specificity, or both.

On August 2, 2016 Christopher Hansen told the Shin/Shinns he would provide them with State Farm's repair estimates as soon as he received them. However, Hansen changed his mind after he received State Farm's repair estimates and learned that State Farm would pay him directly, not the Shin/Shinns. He told the Shin/Shinns State Farm's repair estimates were irrelevant to the cost of repairs and would cause any contractor they selected to inflate its repair estimate. He explained his thinking in greater detail in an email he sent to the Shin/Shinns on August 15, 2016: "I will pay the cost to repair or replace damaged items with similar construction. . . . The obligation is mine. The risk is mine. The insurance policy is mine. If it turns out that State Farm won't pay enough, then I must pay more in order to make up the difference. But, on the other hand, if it turns out that there is some extra in the State Farm payment(s) [than] is needed to repair or replace damaged items with similar construction, then that extra goes in my pocket, not yours. I have good insurance. I paid higher premiums for better coverage. You should not reap the benefit of my choice to pay higher insurance premiums for 13-1/2 years."

On August 9, 2016 State Farm issued a net payment of $160,164.47 to the Hansens to repair the damage to the home. Citing custom cabinetry and other finishing work not contemplated in the original estimate, Christopher Hansen successfully sought, and obtained, additional payments from

5

State Farm in September 2016 (for $19,711.04) and October 2016 ($10,655.18). He also received an additional payment in June 2017 ($29,240.25) for a total replacement compensation of nearly $220,000.

On September 26, 2016 the Hansens offered the Shin/Shinns a global settlement of $105,200, $87,000 of which was designated for repair costs. Christopher Hansen insisted the amount was generous, despite knowing State Farm's August 9, 2016 repair estimate, even before the Hansens managed to increase the payments due, was nearly double the amount the Hansens had offered for repairs. If the Shin/Shinn buyers did not agree, Christopher Hansen wrote, they should provide him with a detailed bid price, "which will almost surely be lower than today's settlement offer." The Shin/Shinn buyers rejected the offer.

4. *The Arbitration of the Hansens' and the Shin/Shinns' Dispute; the Filing of this Lawsuit*

The Shin/Shinns accused the Hansens of breach of contract and breach of the implied covenant of good faith and fair dealing. They arbitrated their dispute in accordance with an arbitration provision in their purchase/sale agreement.

In addition, both the Hansens and the Shin/Shinns sued the broker defendants in Los Angeles Superior Court. Those lawsuits (including the instant action) were ordered consolidated and stayed pending completion of the arbitration.

5. *The Arbitrator's Ruling in Favor of the Shin/Shinns*

The arbitrator, attorney Robert L. Friedenberg of ADR Services, Inc., ruled in favor of the Shin/Shinns on their claims of breach of contract and breach of the implied covenant of good faith and fair dealing and against the Hansens on their contract claims. The arbitrator found, after consideration of all the documentary evidence and oral testimony presented at the arbitration, that the Hansens had breached the clear intent and spirit of the addendum: "This could and should have been relatively simple—Sellers place funds in escrow, work if and when necessary with their homeowner's carrier to fund the repairs, then get out of the way while the Buyers' chosen contractor works with State Farm to complete the repair project and gets paid by State Farm funds. Even after State Farm sent the estimate to its own policyholder first, and then the policy proceeds to Hansen as well, all Hansen had to do was to provide the estimate to Shin (as originally promised) so that Shin could have his selected contractor bid the same scope as the homeowner's carrier and promptly do the work. As with virtually all insurance-paid repair projects, the contractor could work with the claims handler to increase the funds for covered damages. No evidence was presented that State Farm's policy would pay for anything in excess of what the Addendum provided—repair of damage with like-for-like materials. In fact, no homeowner's policy would pay for anything extra unless there was coverage for code upgrades, a factor not present or relevant here.

"With regard to the payment directly to the contractor, early on, State Farm (not a party to the contract even though it was to be the funding entity) did the normal thing and paid its policyholder directly. The Addendum set forth a specific escrow

7

account (Granite Escrow) to hold funds that could become necessary later, but would only be released upon completion of the work to Buyers' satisfaction. Simply depositing the State Farm funds into that escrow account, or a separate one, with instructions to release funds as required during the construction process, would have resolved that issue and kept the Sellers to the sidelines, as the Addendum required. The job may well have been finished in three months, by the end of 2016, as Hansen himself believed when corresponding directly with State Farm. But instead of a simple, clean transaction that would likely have concluded over two years ago, we have our current situation—an empty shell of a house, repair costs of necessity higher due to the long span of time between September 2016 and today, and two parties out many, many thousands of dollars litigating a matter that should have resolved long ago.

"Hansen further breached by requiring his approval of any bid, and withholding that approval from all bids that didn't meet his internal beliefs. As the evidence shows, Hansen privately worked on State Farm to increase the amount of policy proceeds for the job, kept all those funds for himself, while simultaneously criticizing the scope and cost of all bids he made Shin submit to him—six in all before the ATI bid. The bids were [according to Christopher Hansen] either 'skimpy' or 'fat' (including the State Farm estimate by his own admission ('over-generous'), even though he continued to seek more funds) and thus all fell short. Hansen unilaterally modified the core of the contractual arrangement—the Buyers would choose the contractor, not the Sellers."

The arbitrator further found Christopher Hansen attempted from "early on" to "subvert the intent of the Addendum

by offering an artificially low lump sum amount to Shin. This was done despite his knowledge that the State Farm estimate was almost double his own offer, and close in amount as all the bids submitted by Shin. Hansen offered a total of $105,200 on September 25 . . . after he was already paid $160,164 by State Farm on August 9, and that offer included about $18,000 of PITI and only $87,000 for repairs."

According to the arbitrator, the testimony and documentary evidence at the arbitration hearing "glaringly demonstrate[d] a breach of the covenant of good faith and fair dealing by Sellers."

The arbitrator awarded the Shin/Shinns $764,522.25—$310,720.05 in "reasonable cost of repair" damages, $272,133.70 in unpaid PITI and utilities, $181,668.50 in attorney fees and costs as the prevailing party under the contract—plus prejudgment and postjudgment interest. The Shin/Shinns did not petition the court to confirm the arbitration award; the Hansens did not petition to vacate it.

6. *The Hansens' Operative First Amended Complaint Against the Broker Defendants*

In May 2019, following their payment of the arbitration award and the superior court's order lifting the stay of the lawsuit, the Hansens filed a first amended complaint in the case at bar alleging professional negligence, breach of fiduciary duty, and unfair competition/unfair business practice under Business and Professions Code section 17200 et seq.

As to the claims for professional negligence and breach of fiduciary duty, the Hansens alleged the broker defendants had breached duties owed to them by (1) continuing to jointly represent both the Hansens and the Shin/Shinns when it had become clear following the water damage the parties had a new

9

and significant conflict of interest; (2) failing to recommend the Hansens obtain legal advice before signing the addendum; (3) negligently drafting the addendum by failing to ensure, in accordance with the intent of the Hansens and the Shin/Shinns, that State Farm would negotiate with the Shin/Shinns directly concerning the price of repairs, failing to restrict the repair costs to a reasonable amount, and omitting any specific timeframe for completion of repairs while making the Hansens liable for PITI until repairs were completed; and (4) failing to explain to the Hansens their legal obligations under the addendum or consult with legal counsel before preparing the addendum.

The Hansens alleged the broker defendants' negligence caused them to suffer an adverse arbitration award of more than $760,000, which they paid following the arbitrator's ruling. In their prayer for relief for the professional negligence and breach of fiduciary duty causes of action, the Hansens sought compensatory damages of "not less than $1 million," treble damages not to exceed $10,000 (Code Civ. Proc., § 1029.8), punitive damages (for the breach of fiduciary duty only), plus attorney fees and costs.

As to the unfair competition claim, the Hansens alleged Lascano, who was not an attorney, "suggested and prepared" a legal document, the addendum, in violation of Business and Professions Code section 6125 (practicing law without a license). The Hansens sought restitution of $72,800 (the commission they paid to the broker) plus treble damages pursuant to Code of Civil Procedure section 1029.8 and reasonable attorney fees.

7.  *The Broker Defendants' Motion for Summary Judgment*

On November 27, 2019 the broker defendants moved for summary judgment or, in the alternative, summary adjudication as to each cause of action. As to the professional negligence and breach of fiduciary duty claims, the broker defendants asserted there was no breach of any duty. The broker agreement and related documents, which they provided with their motion, had advised the Hansens of the dual representation and told them the parties should consult with counsel if legal or tax advice was desired. No further disclosures, they argued, were required.

In his declaration supporting the broker defendants' motion, Lascano described his actions following the water leak. Lascano recalled that, after the water leak, the Shin/Shinns requested a $50,000 discount off the purchase price. Lascano conveyed that message to the Hansens. Christopher Hansen then responded in a July 26, 2016 email to Lascano with what Hansen described in that email as his "best and final counteroffer." "We [the Hansens] will pay for the repair (together with our insurance company), we will keep holdback money in escrow until repairs are complete, and we will cover the buyers' carrying costs until the house is ready for occupancy. State Farm confirms this is a covered loss. We all heard ServPro say today that they guarantee that the house will be dry and free of mold. Deanna and I agree to use the buyers' preferred contractor for the re-build. The buyers will get a dry house with new interior surfaces of their own choosing. And with the brand new flooring, baseboards, walls, paint and etc., the house will be worth more after the repair than it was when the buyers agreed to the deal two months ago." Hansen continued, "in addition to the foregoing," he and his wife would (1) reduce the purchase price by

11

$22,000; and (2) deposit $50,000 of the sale proceeds into an escrow account to assure the buyers that repairs would be performed "by the buyers' contractor and paid for by State Farm."

On July 27, 2016, Lascano forwarded Christopher Hansen's July 26, 2016 email to Shin. According to Lascano, Hansen's email, and Shin's requests in response, became the terms of the addendum.[1] Lascano stated he prepared and circulated "the initial draft of the Addendum to Mr. Shin on July 28[,] 2016." After receiving the initial draft, Shin asked that Lascano add, "Seller will pay any shortfall of the State Farm funds," which

---

[1] Lascano stated the "first two paragraphs of the Addendum came from Mr. Hansen's [July 26, 2016] email. Mr. Shin required a $60,000.00 holdback [$10,000 more than Hansen had offered] and the addition of [the words] [']to Buyer's Contractor['] in the Second Sentence of paragraph 2. Plus, there was an additional last month's PITI of $8,552.70 to be held in escrow. Paragraph 3 was language provided by Mr. Shin addressing his concerns that Seller will pay the princip[al], interest, taxes and insurance. I included at Paragraph 4, Shin's request that funds would not be released until Buyer[s] are satisfied. This was also a deal term agreed upon and presented by Hansen in his July 26 email, which became paragraph 2 of the Addendum. Mr. Shin wanted Sellers to perform an ambient test to ensure house was moisture free. Shin's terms regarding the moisture test was included in Paragraph 6 of the Addendum. [¶] . . . Mr. Hansen included language that Buyers will be replacing like for like materials and Buyers will pay the difference for upgrades, if they wanted upgrades. This deal term of Mr. Hansen was put in the Addendum at Paragraph 5. Since Mr. Hansen was paying PITI he wanted to make sure that the rebuilt job will not be delayed which was included in Paragraph 8 of the Addendum."

Lascano added to paragraph 9 of the addendum. Lascano then circulated the final draft to the Hansens and the Shin/Shinns. Both the Hansens and the Shin/Shinns signed the addendum without consulting counsel.

The broker defendants also provided a declaration from Alan D. Wallace, an attorney and licensed real estate broker. Wallace opined Lascano had acted in accordance with the standard of care for a licensed real estate agent by providing the appropriate dual agency disclosures and advisements that the broker would not provide legal advice and the parties should seek advice from legal counsel if desired. As to the preparation of the addendum, Wallace stated that, when a property suffers damage while in escrow, "the parties customarily enter into addendums and agreements for continuing work to be completed after the close of escrow with negotiated escrow holdbacks and agreements for completion of the work." "A broker merely puts the parties' deal terms together to contractually bind the parties." He opined, based on his review of Hansen's July 26, 2016 email, that Lascano merely incorporated the terms Hansen requested into the addendum, and accordingly operated within the standard of care governing licensed real estate agents.

Responding to allegations in the first amended complaint that Lascano failed to ensure State Farm was contractually bound to pay the Shin/Shinns directly, Wallace stated, "It is not within the scope of a real estate broker's duties to get third party contractual commitments to ensure performance in case a buyer or seller breaches their own respective contractual commitments." "A real estate purchase transaction involves third party financing, vendors providing service in the course of a transaction, title companies and ongoing contractor repair work.

In any of these situations it is the custom and practice of real estate brokers to get the contractual commitment of the buyer and seller to the transaction and not to include third parties." Wallace opined, "[B]ased upon my experience in the custom and practice of a real estate broker, there was no other commitment necessary from State Farm since Hansen agreed to pay Buyer's Contractor with the State Farm funds. In my experience with the custom and practice of real estate brokers, obtaining such a contractual commitment from an insurance company for an agreement between a buyer and seller is outside the scope of duty for a licensed real estate broker."

As to the unfair competition claim, the broker defendants argued Lascano had acted merely as a scrivener in preparing an addendum the Hansens had negotiated with the Shin/Shinns and therefore did not engage in the unauthorized practice of law.

As to all causes of action, the broker defendants argued that the Hansens could not prove causation, an essential element of each claim. Citing the arbitrator's decision, which they included with their motion (and to which the Hansens did not object), as well as other evidence, the broker defendants argued it was Christopher Hansen's own breach of the addendum and bad faith conduct that had caused him to suffer the injury he claimed—the arbitration award and associated costs—and not any negligence or breach of duty by the broker defendants in connection with preparation of the addendum.

### 8. *The Hansens' Opposition to the Broker Defendants' Motion for Summary Judgment/Summary Adjudication*

In their opposition papers the Hansens argued the broker defendants did not carry their initial burden on summary judgment with respect to their professional negligence action. In particular, the Hansens asserted the broker defendants failed to address, either through Wallace's declaration or otherwise, the allegation that continuing to represent both the Hansens and the Shin/Shinns after the water damage occurred constituted a breach of their professional duty of care.

In addition, the Hansens argued triable issues of material fact existed as to whether the broker defendants had breached their duty of care and fiduciary duty to the Hansens. The Hansens provided an expert declaration from attorney Lawrence H. Jacobson, a special prosecutor for the State Bar of California with an expertise in "business, real estate and ethics matters." Jacobson opined the broker defendants "fell below the standard of care by failing to conform to the custom and practices of a reasonably competent real estate agent and broker, by performing services beyond the ability and training of a real estate licensee." Responding to Wallace's declaration, Jacobson stated the broker defendants fell below the standard of care for real estate brokers/agents by drafting the addendum. "While it is certain that it is the custom and practice of real estate agents to fill in the blanks in C.A.R. forms or simple addenda, custom and practice does not extend to drafting complex documents with significant legal issues and consequences. The events which led to this case were not a simple price adjustment or extension of the close of escrow. It was a major construction project, which contained significant issues far beyond the experience,

qualifications or expertise of a real estate agent." Jacobson continued, "If Lascano chose to act like a lawyer, he should be held to the standard of one. If a lawyer had drafted the addendum, he would clearly have committed malpractice."

The Hansens also insisted triable issues of material fact existed as to whether Lascano was merely a scrivener of the Hansens' and the Shin/Shinns' agreement. In his declaration, Christopher Hansen stated the notion of drafting an addendum was Lascano's idea, not the Hansens' or the Shin/Shinns'. Hansen stated he had initially thought he would take the house off the market until it could be repaired, but Lascano assured him Lascano could draft an addendum that would salvage the deal. It was Lascano, Hansen asserted, who drafted an initial addendum on July 24, 2016, a fact, Hansen noted, Lascano did not mention in his declaration.[2] In agreeing to move forward

---

[2] The July 24, 2016 draft addendum prepared by Lascano was different from, and simpler than, the final addendum. It contained four paragraphs: (1) "Seller agrees to hold back in escrow two times the amount of the cost to repair any and all damages caused by water damage. Servpro to provide a detailed outline of all work to be completed along with dollar amount to restore all damaged surfaces. If Sellers do not finish/restore/complete any of the work Servpro proposed, Buyer will be entitled to cost to complete from holdback funds." (2) "Seller agrees to pay Buyer's PITI (princip[al], interest, taxes and insurance) from close of escrow until completion of all restoration work. Buyer's daily PITI is $[___]. [¶] Seller will leave 30 days' worth of Buyer's PITI in escrow at close of escrow as additional good faith, and will issue a personal check to Buyer every 30 days until all work is completed." (3) "Once Seller and ServPro have notified Buyer that all work has been completed by

with the sale, Hansen stated, "I assumed that Lascano or another agent at Hilton & Hyland had experience with property sustaining damage during escrow and he or they knew State Farm would pay the Buyer's contractor as stipulated by" the addendum.

As to causation, the Hansens argued the addendum provided that State Farm would pay the buyers' contractor. However, State Farm told the Hansens after the addendum was signed that its policy was to work with and pay its insured, not a third party. If the Hansens had known that State Farm would not work with the Shin/Shinns' contractor directly, the Hansens asserted, they and the Shin/Shinns "would undoubtedly have made different decisions." The Hansens also argued that Lascano's negligence in drafting language that imposed no limitations on repair costs other than mandating "like-for-like" materials and that left them responsible for any costs State Farm did not cover placed the Hansens "between a rock and a hard place—don't turn over the State Farm funds and be found to breach the contract or turn over the State Farm funds and get taken to the cleaners." According to Christopher Hansen, once State Farm "refused to negotiate" with the Shin/Shinns directly as to the cost of repairs, "I tried to protect myself and ensure we only paid market rates for 'like for like' materials in quantities existing when the house was sold to the Buyers. I was very

_____

Seller and Servpro, Buyer will approve all finish work at final walk through and agrees to sign off the release of hold back funds to Seller less any PITI that Seller may still owe to Buyer."
(4) "Buyer understands that Seller will be replacing like-for-like materials. If Buyer wishes to upgrade . . . Buyer will pay the cost difference for upgraded choice."

concerned because the Addendum obligates my wife and me to pay any shortfall between the monies paid by State Farm and the cost of repair."  "In addition, I know the Buyers intended to upgrade some of the materials, such as installing better grade kitchen cabinets, and I wanted to ensure my wife and I did not pay for the extra cost of those materials.  Lascano told me before the original purchase/sale agreement was signed in May 2016 that the Buyers were considering a remodel of the house."  Hansen declared two of the contractors the Shin/Shinns proposed had told him Shin had instructed them to inflate their bids.

The Hansens also included with their opposition papers a declaration from Sandra Tatum, the manager of the State Farm's large claims division that handled the Hansens' insurance claim.  Tatum explained State Farm's policy was to discuss the claim with its insured and "would not have negotiated with Mr. Shin's contractor to arrive at a cost of repair" or pay the Shin/Shinns directly.  Tatum told the Shin/Shinns when they asked for State Farm's repair estimates in August 2016 that "State Farm is not able to assist you as a non-party to the insuring agreement."

The Hansens also cited portions of the arbitrator's award in their opposition to the motion for summary judgment/summary adjudication, arguing even the arbitrator thought the addendum was flawed and Lascano probably bore some responsibility for the situation.

9.  *The Broker Defendants' Reply*

In their reply in support of their motion for summary judgment/summary adjudication the broker defendants argued, among other things, the Hansens failed to raise any triable issue of material fact as to causation.

18

10. *The Order Granting Summary Judgment*

The court granted the broker defendants' motion for summary judgment. Citing the parties' conflicting expert declarations, the court found triable issues of material fact existed as to whether Lascano had breached any fiduciary duty and other duties of care by preparing a complex addendum to the purchase agreement without consulting with counsel. However, the court ruled summary judgment was proper because the Hansens could not demonstrate but-for causation as required for professional negligence cases: The undisputed evidence established it was Christopher Hansen's own misconduct that caused the Hansens to suffer the injury he claimed, not any of the alleged breaches of duty by the broker defendants. As to the unfair competition/unfair business practice claim, the court also found the undisputed evidence established as a matter of law that Lascano had acted merely as a scrivener of the parties' own deal terms in writing the addendum.

The Hansens filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant may bring a motion on the ground the plaintiff cannot prove one of the required elements of the case or there is a complete defense to the action. (Code of Civ. Proc., § 437c, subds. (*o*)(1), (2) & (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

19

To carry its initial burden when the motion is directed to the plaintiff's case rather than an affirmative defense, the defendant must present evidence that either negates an element of the plaintiff's cause of action or shows that the plaintiff does not possess, and cannot reasonably obtain, evidence necessary to establish at least one element of the cause of action. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at pp. 853-854.) Only after the defendant carries that initial burden does the burden shift to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

We review a grant of summary judgment de novo (*Samara v. Matar* (2018) 5 Cal.5th 322, 338) and, viewing the evidence in the light most favorable to the nonmoving party (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618), decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)

    2. *The Hansens Failed To Demonstrate Triable Issues of Material Fact as to Causation, an Essential Element of Each of Their Claims*

       a. *Governing law on professional negligence*

"The elements of a cause of action for professional negligence are (1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from

the professional negligence." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; *Wise v. DLA Piper LLP* (US) (2013) 220 Cal.App.4th 1180, 1190.)

To prove causation in a professional negligence matter, the plaintiff must demonstrate that but for the alleged professional negligence, the plaintiff would have obtained a more favorable outcome. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 (*Viner*); *Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1581-1582.) Speculation as to what could have occurred absent the professional negligence is insufficient. (*Viner*, at p. 1241 ["[t]he purpose of this [but for] requirement . . . is to safeguard against speculative and conjectural claims"].) Although causation is usually a question of fact, it may be decided as a matter of law if, under undisputed facts, there is no room for a reasonable difference of opinion as to the legal effect of the evidence presented. (*Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 526; *Namikas,* at p. 1583; *Moua v. Pittullo, Howington, Baker, Abernathy LLP* (2014) 228 Cal.App.4th 107, 113.)

b. *The trial court did not err in considering the arbitrator's ruling*

Citing language from the court's summary judgment ruling,[3] the Hansens argue "as a threshold matter" the trial court

---

[3]  In its ruling granting summary judgment the court stated, "According to the arbitration award, [the] Hansens breached the Addendum's implied covenant of good faith and fair dealing in refusing to pay Shin/Shinn's contractors. These findings are binding. (CCP 1287.6 ('An award that has not been confirmed or vacated has the same force and effect as a contract in writing between the parties to the arbitration'); Evid Code § 622 ('The facts recited in a written instrument are conclusively presumed

erred in crediting the arbitrator's findings as facts and concluding, based on those findings, that the Hansens could not establish causation in this case. The broker defendants respond that, when, as here, the only injury alleged is an arbitration award, the basis for that award is relevant and properly considered by the court. They observe that the Hansens not only failed to object to the arbitration ruling as an evidentiary matter, but they also cited the arbitrator's findings in their opposition papers.

The Hansens are generally correct the arbitrator's ruling was not binding as a contract between the parties to this action (see Code Civ. Proc., § 1287.6) and had no preclusive effect. (See *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 834 [unless the arbitral parties agreed otherwise, a private arbitration award has no nonmutual collateral estoppel/issue preclusion effect, whether or not the award was judicially confirmed].) But the arbitration award was properly before the trial court and appropriately considered by it with the other evidence submitted by the parties. We, too, may consider it, along with all the other evidence, as part of our de novo review. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [our de novo review considers ""all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained""].) To the extent the court incorrectly understood the

to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration.'). And these findings are conclusive in precluding the Hansens from recovering for their own wrongdoing. (*See also* Civ. Code § 3517 ('No one can take advantage of his own wrong').)"

arbitrator's ruling as "conclusive" and "binding," which is by no means clear despite the language the court used, we review the court's ruling, not its reasoning. (*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 934 [appellate court reviews trial court's ruling, not its rationale]; *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1127 [same].)

   c.  *The Hansens presented no nonspeculative evidence to establish causation*

  In their moving papers the broker defendants presented evidence, including Christopher Hansen's emails to the Shin/Shinns and his receipt of payments from State Farm, to demonstrate the Hansens breached the addendum. They also cited the arbitration award for the proposition that the only injury the Hansens alleged—the adverse arbitration award—was a result of their own conduct, not any negligence or misconduct by the broker defendants. Taken together, this evidence shifted the burden to the Hansens to demonstrate a triable issue of material fact as to whether any of the negligence they alleged on the part of the broker defendants caused their injury.

  The burden having shifted to them on the issue of causation, the Hansens contend, had Lascano done his job and discovered State Farm would not negotiate with and pay the Shin/Shinns' contractor directly, the Hansens and the Shin/Shinns would undoubtedly have agreed to a different arrangement or the Hansens would have walked away from the deal. However, they presented no evidence, direct or circumstantial, a different arrangement with better terms with the Shin/Shinns was possible (see *Viner*, *supra*, 30 Cal.4th at pp. 1242-1243) or that abandoning the sale would have led to a

23

better outcome than would have been achieved under the addendum as drafted had they complied with its terms. (See *Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1227 [causation was not established where Viners "failed to present any evidence to prove they would have been better off economically under this 'no deal' scenario"].) A no-deal scenario would have left the Hansens obligated to pay for repairs to the home working with their insurance company. True, they say, but they would not have had to pay an arbitration award of more than $760,000. That is, according to the Hansens' theory of the case, but for the negligently crafted addendum that left them responsible for repairs not covered by State Farm, with no reasonable limitations on cost, Christopher Hansen would not have been in the untenable position of having to negotiate with the Shin/Shinns' contractor directly to ensure there were no hidden upgrades for which he should not be charged. It was that conduct, made necessary by the addendum, they assert, that led to the adverse arbitration ruling against them.

The contention the broker defendants' negligence created the opportunity for Christopher Hansen to act as he did stretches "but for" causation beyond its breaking point. To be sure, the addendum was part of the chain of events that led to Hansen micromanaging the construction process, withholding funds designated for repairs while negotiating for more money for himself. But the addendum did not contemplate, let alone compel, that conduct. (See *Viner, supra,* 30 Cal.4th at p. 1241 [causation is lacking "where the client's own misconduct or misjudgment causes the problems"].)

Quoting from the arbitrator's ruling, the Hansens emphasize that even the arbitrator believed the addendum was

flawed and that the broker defendants bore some responsibility for the disputes that arose between the Hansens and the Shin/Shinns. The arbitrator wrote, "The agreement has some flaws and failed in one obvious way to account for what should happen if State Farm would not deal directly with the Buyers or their chosen contractor, but instead pay Hansen directly. (As an aside, Lascano may and probably should be held responsible to both parties for failing to help or get involved once the circumstances with State Farm changed, but neither he nor Hilton & Hyland was a party to this arbitration and had no opportunity to defend this action, or more appropriately, inaction, and disappearance after close of escrow.)" The Hansens stop their quotation from the ruling there. Had they continued, they would have included the arbitrator's conclusion that, despite any flaws in the addendum, it was the Hansens, in an effort to maximize their gains and minimize their losses, that caused their own harm by subverting not just the letter, but the clear intent of the addendum.[4]

More significantly, whether or not the Hansens' withholding of cost-of-repair funds was in bad faith, the Hansens' inability as a matter of law to tie their claimed injury to the broker defendants' negligence is manifest. As discussed, to raise

---

[4]     Following his aside, the arbitrator stated, "Still, the intent of the Addendum to the Purchase Agreement was abundantly clear—payment for repairs to the property would be performed by contractors chosen by buyers and paid for by State Farm to Buyers' contractor." The arbitrator continued, the contract "manifestly did not contemplate the Sellers holding the funds and exerting a veto power over the choice of contractor and amount to be paid."

a triable issue of fact as to causation, the Hansens were required to provide evidence they would have obtained a better outcome but for the negligence of the broker defendants. They cannot. They concede they intended to pay for reasonable costs of repairs, but claim, due to the broker defendants' negligence, found themselves liable for an arbitration award that far exceeded that sum. The award, however, was comprised of (1) the reasonable cost of repairs (as of March 2019, due to the Hansens' delay in payment, rather than July 2016); (2) unpaid PITI (three years' worth due to the Hansens' delay); (3) and interest and attorney fees for the Hansens' breach. None of those damages was due to the alleged negligent acts or omissions of the broker defendants. All were the result of the Hansens' failure/delay in paying the Shin/Shinns.

In sum, the broker defendants carried their initial burden on summary judgment to demonstrate the Hansens could not prove causation with respect to the injury alleged. Rather than create a triable issue of fact on that question, the Hansens' opposition papers only reinforced the broker defendants' argument on that point.

> d. *The Hansens' causes of action for breach of fiduciary duty and unfair competition/unfair business practice similarly fail*

The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty and resulting damage. (*Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th at p. 820.) For the reasons discussed, the Hansens cannot show the broker defendants' alleged negligence caused their injury. Accordingly, the court did not err in finding the Hansens had failed to demonstrate any

26

reasonable trier of fact could find in their favor on this essential element.

The "unfair competition law (Bus. & Prof. Code, § 17200 et seq.) authorizes civil suits for 'unfair competition' [citation], which it defines to 'include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' [Citation.] . . . [Citation.] 'By defining unfair competition to include any "*unlawful . . .* business act or practice" [citation], the [unfair competition law] permits violations of other laws to be treated as unfair competition that is independently actionable.'" (*In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1266; accord, *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.)

Citing Jacobson's declaration that the addendum was beyond the expertise of a real estate agent and Christopher Hansen's declaration that the ideas in the addendum, including those in his July 26, 2016 email, originated with Lascano, the Hansens contend they raised a triable issue of material fact as to whether Lascano was merely a scrivener and whether he violated Business and Professions Code section 6125 when he drafted the addendum. (See Bus. & Prof. Code, § 6125 [ "[n]o person shall practice law in California unless the person is an active licensee of the State Bar"]; *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 128 [unauthorized practice of law includes giving legal advice and preparing legal instruments and contracts].)

For this cause of action, too, the Hansens must be able to demonstrate at trial that their injury was caused by the alleged unfair competition. (Bus. & Prof. Code, § 17204 [private plaintiff has standing to proceed under unfair competition law only if he

27

or she suffered injury "as a result of the unfair competition"]; *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326 [section 17204 of the Business and Professions Code imposes an element of causation into this cause of action].)  Although the Hansens might be able to recover the commission paid to the broker defendants as a form of restitution if they proved their unfair competition claim, the only injury alleged as a result of Lascano's purported unauthorized practice of law was the preparation of the addendum.  As discussed, that conduct did not cause the injury identified by the Hansens.  The Hansens' inability to demonstrate causation is fatal to this claim.

## DISPOSITION

The judgment is affirmed.  The broker defendants are to recover their costs on appeal.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.

28